RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0194p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

STEPHEN GMEINER; DEBORAH GMEINER,

*Plaintiffs-Appellants*,

*v.*

KERI KENT, in her individual and official capacities,

*Defendant-Appellee*.

No. 25-2000

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:25-cv-00502—Robert J. Jonker, District Judge.

Argued:  June 3, 2026

Decided and Filed:  July 10, 2026

Before:  SUTTON, Chief Judge; LARSEN and MURPHY, Circuit Judges.

───────────────

### COUNSEL

**ARGUED:**  Philip L. Ellison, OUTSIDE LEGAL COUNSEL, PLC, Hemlock, Michigan, for Appellants.  Gregory G. Justis, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.  **ON BRIEF:**  Philip L. Ellison, OUTSIDE LEGAL COUNSEL, PLC, Hemlock, Michigan, for Appellants.  Gregory G. Justis, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

───────────────

### OPINION

───────────────

MURPHY, Circuit Judge.  Stephen and Deborah Gmeiner needed a permit to construct a walking path on their lakeside property in northern Michigan.  Keri Kent, an analyst with a Michigan agency, eventually granted this permit on the condition that the Gmeiners agree to

"indemnify and hold harmless" Michigan for "all claims or causes of action arising from" the "acts or omissions" that the Gmeiners took in "connection with [the] permit." Permit, R.1-4, PageID 42. The Gmeiners sued over this indemnification clause, reading it broadly to relieve Michigan of liability even for its own misconduct in a suit they might bring against the State. The Gmeiners claimed that the clause imposed an unconstitutional condition on their ability to obtain the permit because it burdened their First Amendment right to petition the government (by filing a lawsuit). They also claimed that Michigan law did not give Kent the power to impose the indemnification clause. But the district court dismissed these federal and state claims at the pleading stage.

We agree with this outcome. As for the federal constitutional claim, the Gmeiners' theory has several problems. They simply assume that the Supreme Court's unconstitutional-conditions test for the Takings Clause applies to the Petition Clause too. And they misread the scope of the indemnification clause, which requires the Gmeiners to indemnify the State only for their own misconduct. When correctly read, the clause would pass muster even under the unconstitutional-conditions test that the Gmeiners ask us to apply. As for the state-law claim, Michigan's sovereign immunity bars the Gmeiners from seeking in federal court a declaration that state officials violated state law or an injunction against those officials on state-law grounds. We affirm.

I

Torch Lake sits northeast of Traverse City in the northwest corner of Michigan's lower peninsula. This lake, Michigan's longest, runs for about 19 miles from its northern tip to its southern end. Many have described the lake as the "Caribbean of the North" because its clear turquoise waters resemble those found much farther south. The local government even touts that *National Geographic* once named Torch Lake "the third most beautiful lake" in the world. *Facts*, Torch Lake Township (last visited July 9, 2026), https://torchlaketownship.org/facts.html. It is no surprise, then, that Torch Lake's natural beauty has attracted many to its shores, including Stephen and Deborah Gmeiner.

In June 2021, the Gmeiners bought one acre of waterfront property on the lake in Milton Township, Michigan.  The Gmeiners have not built a home on the property and instead use it for recreation.  Wetlands cover about half the property, making it difficult to walk from a nearby road to the waterfront.  The Gmeiners thus planned to build a ground-level walking path (in contrast to an elevated boardwalk) from the road through the wetlands to the water's edge.

Yet this ground-level path would destroy some of the already-diminished wetlands surrounding Torch Lake.  So Michigan's Natural Resources and Environmental Protection Act required the Gmeiners to get a permit to construct the path from the Michigan Department of Environment, Great Lakes, and Energy.  *See* Mich. Comp. Laws § 324.30304.  Under the Act, this Department could issue the permit if it found that its "issuance" was "in the public interest," that the permit was "necessary to realize the benefits derived from the [proposed] activity," and that the proposed "activity [was] otherwise lawful."  *Id.* § 324.30311(1).  These factors required the Department to consider, among other things, whether there was a "feasible and prudent alternative" to the proposal that would inflict less harm on the wetlands.  *Id.* § 324.30311(4)(b).

The Gmeiners applied for a permit to build a walking path in February 2023.  The Department assigned one of its analysts, Keri Kent, to consider the application.  Kent initially denied the permit because of the "significant adverse effects" on the wetlands and the "[f]easible and prudent alternative[]" of building a boardwalk.  Letter, R.1-1, PageID 12–13.

The Gmeiners fared better in the administrative-appeal process.  They requested a "formal hearing" to challenge Kent's denial.  Mich. Comp. Laws § 324.30319(2).  In December 2024, an administrative law judge granted the permit.  Among other reasons for this reversal, the judge found that the Gmeiners could not feasibly build a boardwalk because Milton Township interpreted its ordinance to require them to construct a home as a condition for such a raised path.

Kent sent the Gmeiners a draft permit in February 2025.  The permit imposed some "limitations" that displeased the Gmeiners.  Permit, R.1-4, PageID 42.  Of most note, it included an indemnification clause:

The permittee shall indemnify and hold harmless the State of Michigan and its departments, agencies, officials, employees, agents, and representatives for any and all claims or causes of action arising from acts or omissions of the permittee, or employees, agents, or representative[s] of the permittee, undertaken in connection with this permit. The permittee's obligation to indemnify the State of Michigan applies only if the state: (1) provides the permittee or its designated representative written notice of the claim or cause of action within 30 days after it is received by the state, and (2) consents to the permittee's participation in the proceeding on the claim or cause of action. It does not apply to contested case proceedings under the Administrative Procedures Act, 1969 PA 306, as amended, challenging the permit. This permit shall not be construed as an indemnity by the State of Michigan for the benefit of the permittee or any other person.

*Id.* The Gmeiners did not feel comfortable agreeing to this condition. They also claimed that no Michigan law authorized it.

The Gmeiners thus asked Kent to amend the indemnification clause. They sought to clarify that nothing in the permit would "abridge" their "right" to assert "claims" against Michigan for its pre-permit conduct. Emails, R.1-3, PageID 37. The Department rejected this change because the indemnification clause contained its "standard permit language." *Id.*, PageID 36. On March 10, 2025, Kent formally issued the permit with the indemnification clause. The Gmeiners, however, refused to sign the permit and maintain that it has not validly "issued" as a result. Compl., R.1, PageID 5–6.

This impasse led the Gmeiners to sue Kent. Their complaint asserted one federal claim and one state claim. As for the federal claim, the Gmeiners alleged that the indemnification clause imposed an unconstitutional condition on their ability to receive the permit. They argued that the clause intruded on their "First Amendment right to petition the government" because they read it to limit their ability to sue the Department. *Id.*, PageID 6–7. As for the state claim, the Gmeiners alleged that no Michigan law allowed the Department to impose the indemnification clause. They thus said that Kent's decision to add it qualified as an "ultra vires" action. *Id.*, PageID 8–9. The Gmeiners sought damages, an injunction, and a declaratory judgment. They later moved for a preliminary injunction to enjoin Kent from conditioning the permit on the indemnification clause. In response, Kent both opposed the requested injunction and moved to dismiss the complaint.

The district court ruled for Kent across two orders.  Its first order denied the Gmeiners a preliminary injunction.  Its second order dismissed their complaint.  *Gmeiner v. Kent*, 807 F. Supp. 3d 768, 777 (W.D. Mich. 2025).  The court rejected the Gmeiners' unconstitutional-conditions claim by interpreting the indemnification clause narrowly.  *See id.* at 773–74.  Under the court's view, the clause did not relieve the State from liability for misconduct and only prevented the Gmeiners from holding it liable for their own misdeeds.  *See id.*  The court saw no theory under which this reading violated the Petition Clause.  *See id.* at 773–75.  The court next rejected the Gmeiners' claim that the clause violated state law.  *See id.* at 775–77.  It reasoned that sovereign immunity barred them from pursuing this claim in federal court.  *Id.* at 776–77.

## II

The Gmeiners challenge both the dismissal of their complaint and the denial of their requested injunction.  We must review the district court's dismissal of the complaint de novo, accepting as true the complaint's "factual allegations" (but not its "legal conclusions").  *Rudd v. City of Norton Shores*, 977 F.3d 503, 511 (6th Cir. 2020).  And because we agree with the decision to dismiss the complaint, we need not separately review the Gmeiners' request for an injunction.  That dismissal shows they have no likelihood of success on the merits.  *See James B. Oswald Co. v. Neate*, 98 F.4th 666, 672 (6th Cir. 2024).  We will evaluate their federal and state claims in turn.

### A. Federal "Unconstitutional Conditions" Claim

The Gmeiners first argue generically that the indemnification clause violates the unconstitutional-conditions doctrine.  But they misunderstand the nature of an unconstitutional-conditions claim.  So we begin with a refresher on this constitutional theory.

### 1

A typical constitutional claim seeks to stop the government's use of its coercive powers.  Private speakers might bring a challenge under the Free Speech Clause to a law that makes certain speech illegal and enforces this speech ban through a criminal sanction.  *See, e.g., Counterman v. Colorado*, 600 U.S. 66, 70–71 (2023).  Or private gunowners might bring a

challenge under the Second Amendment to a similar criminal law that limits their right to carry a gun. *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 11–12 (2022). In both examples, the government has directly restricted its people's freedom of action.

The "unconstitutional-conditions" doctrine addresses a different problem. Modern governments provide many things that people might want but that the governments have no duty to provide (for example, a public job, a money grant, or a building permit). *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 209–10, 213 (2013) (*AOSI*) (grants); *Sheetz v. County of El Dorado*, 601 U.S. 267, 272, 274–76 (2024) (permits); *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 566–68 (1968) (jobs). What happens if the government "indirectly interferes with" a constitutional right "by offering" this type of public "benefit" "on the condition that a party waive [the] right"? *Knight v. Metro. Gov't of Nashville & Davidson Cnty.*, 67 F.4th 816, 823–24 (6th Cir. 2023). As an abstract matter, the unconstitutional-conditions doctrine restricts the ability of the government to extract a waiver of constitutional rights as a condition of granting these sorts of benefits. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

Yet it is somewhat of a misnomer to call this idea a uniform "doctrine." The Constitution includes "no all-encompassing 'Unconstitutional Conditions Clause.'" *Knight*, 67 F.4th at 824 (quoting *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 911 (6th Cir. 2019) (en banc)). So the Court has adopted different rules for different rights. *See id.* These rules all start with an obvious right-specific baseline: If the relevant constitutional right would permit the government to directly impose the challenged requirement as a coercive command on all people, it may indirectly impose that requirement as a condition on a benefit that it need not provide. *See id.* If, though, the government could not *directly* impose the requirement, courts must then look to the "specific constitutional right" at issue to "identify the specific rules" for whether it may still *indirectly* impose the requirement as a condition on a benefit. *Id.*

Consider some free-speech examples. When addressing challenges to speech conditions on money grants, the Supreme Court asks whether a condition restricts speech that falls within the "government spending program" or tries "to leverage funding to regulate speech outside the

contours of the program itself." *AOSI*, 570 U.S. at 214–15. It has upheld the former (inside-the-program) conditions but rejected the latter (outside-the-program) ones. *See id.* at 214–17. And when considering a public employee's challenge to a personnel action based on the employee's speech, the Court follows similar rules. *See Lane v. Franks*, 573 U.S. 228, 235–37 (2014). It distinguishes on-the-job speech that employees convey as part of their duties (unprotected) from off-the-job speech they convey as private citizens (potentially protected). *See Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006); Randy J. Kozel, *Leverage*, 62 B.C. L. Rev. 109, 133–34, 136–38 (2021).

Or consider an example under the Fifth Amendment's Takings Clause. The government often grants a building permit on the condition that a landowner "deed over a part of the land" or pay a fee. *Knight*, 67 F.4th at 824; *see Koontz*, 570 U.S. at 612. The Court has held that the government must satisfy "two" requirements to impose this type of condition without violating the ban on taking property without just compensation. *Sheetz*, 601 U.S. at 275. First, an "essential nexus" must exist between the conditional taking of property and a land-use harm that the construction will inflict. *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 837 (1987). Second, there must be a "rough proportionality" between the amount of land or money taken and the alleged construction-related harms to the community. *Dolan v. City of Tigard*, 512 U.S. 374, 391 (1994).

This law shows that we must start with the "specific constitutional right" that the Gmeiners invoke: the First Amendment's Petition Clause. *Knight*, 67 F.4th at 824. As incorporated against the States by the Fourteenth Amendment, the Petition Clause bars state actors from "abridging . . . the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. The Gmeiners' reasoning runs as follows: They read the indemnification clause broadly to require them to reimburse the State even for "litigation they might bring to challenge the State's" misconduct. Appellants' Br. 16 (emphasis omitted). And they contend that the Petition Clause grants a right to "petition" the courts by filing a lawsuit. *See Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011). The Gmeiners say that the indemnification clause affects this right "by making [them] bear the risk and cost of" the State's wrongdoing and their own litigation challenging it. Appellants' Br. 13. They next argue that the

takings test from *Nollan* and *Dolan* "applies" to permit conditions that burden the right to petition. *Id.* at 13 n.1. And they conclude that the indemnification clause has no nexus or proportionality to their construction.

This reasoning has two problems. *Problem One*: The Gmeiners do not explain why the unconstitutional-conditions test for the *Takings Clause* extends to the *Petition Clause*. They instead drop a footnote with the conclusory claim that the takings test from *Nollan* and *Dolan* "applies across constitutional rights." *Id.* But we have some doubts about this proposition.

To start, the Supreme Court has never extended its "two-part" unconstitutional-conditions test in the takings context to other rights. *Sheetz*, 601 U.S. at 275. Rather, the Supreme Court has generally read the Petition Clause in lockstep with a different right: the Free Speech Clause. *See* Gary Lawson & Guy Seidman, *Downsizing the Right to Petition*, 93 Nw. U. L. Rev. 739, 751 (1999). It, for example, uses the same First Amendment rules to evaluate allegedly defamatory speech—no matter whether that speech is "made in a petition" or in other media. *McDonald v. Smith*, 472 U.S. 479, 485 (1985). Even more relevant, the Court has held that the First Amendment allows public employers to discipline employees for their *petitioning* unless the employees can satisfy the constitutional test that applies to a public employer's discipline for employee *speech*. *See Guarnieri*, 564 U.S. at 389–99. So in the one unconstitutional-conditions context in which the Court has considered a claim under the Petition Clause, it has looked to free-speech (not takings) precedent. *See also Berkshire v. Dahl*, 928 F.3d 520, 532 (6th Cir. 2019); *Valot v. Se. Loc. Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1226 (6th Cir. 1997). If we were to choose from among the competing unconstitutional-conditions tests, then, this caselaw might point us to the tests governing speech conditions. *Cf. Kaahumanu v. Hawaii*, 682 F.3d 789, 809–10 (9th Cir. 2012); *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1038–41 (9th Cir. 2009).

That said, the Court has also cautioned that an "essential equivalence" may not always exist between the Petition Clause and the Free Speech Clause. *Guarnieri*, 564 U.S. at 388. It has instead instructed courts to consider the Petition Clause's unique text and history when deciding on its scope. *See id.* With roots dating to the Magna Carta, the Petition Clause codified a preexisting right likely "borrowed from the declaration of rights in England, on the revolution

of 1688[.]"  3 Joseph Story, *Commentaries on the Constitution of the United States* § 1888, at 745 (1833); *Guarnieri*, 564 U.S. at 395–96.  The English Declaration of Rights provided that "it is the Right of the Subjects to petition the King, and all Commitments and Prosecutions for such Petitioning are Illegal."  1 W. & M., 2d sess., ch. 2, 6 Statutes of the Realm 143; *see* 2 St. George Tucker, *Blackstone's Commentaries* 142–43 (1803).  And many American sources discussed this preexisting right before the founders enshrined it in the First Amendment.  *See, e.g.*, 5 The Founders' Constitution 199–207 (Philip B. Kurland & Ralph Lerner eds., 1987).

But the parties offer no input on what to make of this history.  Indeed, they do not cite a single case about the Petition Clause or otherwise discuss its original meaning.  So the Gmeiners identify nothing in the clause's unique text or history to suggest that we should depart from the speech framework by following the unconstitutional-conditions test for takings claims.  And for her part, Kent offers no opinion on what unconstitutional-conditions test should govern here.

Where does this lack of briefing leave us?  On the one hand, our "independent obligation to get the law right" perhaps allows us to figure out the proper test for petitioning claims on our own.  *United States v. Jones*, 53 F.4th 414, 417 (6th Cir. 2022).  On the other hand, we need not address the validity of all legal assumptions that the parties make in their briefing without regard to "ordinary forfeiture and waiver rules."  *Ken Lick Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 129 F.4th 370, 381 (6th Cir. 2025); *see Warner Chappell Music, Inc. v. Nealy*, 601 U.S. 366, 371 (2024); *NASA v. Nelson*, 562 U.S. 134, 147 n.10 (2011).  And the Gmeiners have forfeited any claim other than one under the takings test.  *See Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 881–82 (6th Cir. 2024).  So while that test may not apply here, we will "proceed[] with caution" by "assum[ing], without deciding," that it does.  *NASA*, 562 U.S. at 138, 147 n.10.

*Problem Two*: The Gmeiners misread the indemnification clause.  They argue that the clause burdens their petitioning rights because it requires them to "assume financial responsibility for . . . litigation they might bring" against the State of Michigan based on its own misconduct.  Appellants' Br. 16 (emphasis omitted).  But the clause does no such thing.  It covers only "claims or causes of action" that arise from the "acts or omissions of the *permittee*" (or its agents) that were "undertaken in connection with th[e] permit."  Permit, R.1-4, PageID 42 (emphasis added).  The Gmeiners do not explain how this text could reach their own "claims"

challenging the "acts" of *Michigan*. *Id.* The text instead applies only if some claim pursued against Michigan springs from an "act[] or omission[]" of the Gmeiners. *Id.* If, for example, the Gmeiners negligently construct the walking path and their negligence injures a guest, they might have to indemnify Michigan if this injured guest sues (and recovers damages from) the State.

Two other data points confirm this reading. For starters, the indemnification clause gets triggered only if Michigan gives the Gmeiners "written notice" of a suit filed against it and only if it consents to their "participation" in that suit. *Id.* This language makes little sense if the clause applied to a suit by the Gmeiners themselves. In addition, the clause exempts "contested case proceedings under" Michigan's "Administrative Procedures Act . . . challenging the permit." *Id.*; *see* Mich. Comp. Laws § 24.271. So the clause itself says it would not apply to a lawsuit that the Gmeiners might bring against the State seeking "judicial review" under the Administrative Procedures Act of some "final decision" about the permit. Mich. Comp. Laws § 24.301.

At oral argument, Kent's counsel—an assistant attorney general for Michigan—put the Gmeiners' fears to further rest. Counsel represented that the indemnification clause applies only to the Gmeiners' acts and omissions and that the State would not argue otherwise in future litigation. Arg. at 16:15–17:00. He added that Michigan would not seek indemnification if the Gmeiners sued to challenge provisions in the permit or Michigan's interpretation of the permit in state court. *Id.* at 17:00–18:02. These representations likely would limit the State's ability to shift gears in future litigation under traditional estoppel principles. *Cf. New Hampshire v. Maine*, 532 U.S. 742, 749 (2001); *Paschke v. Retool Indus.*, 519 N.W.2d 441, 444 (Mich. 1994).

When pressed to justify their broad reading of the indemnification clause at argument, the Gmeiners' counsel switched to a different theory. He argued that the clause would require them to pay Michigan's costs and attorney's fees in defending frivolous suits that a *third party* might bring against the State challenging the Gmeiners' conduct. Arg. at 5:09–33. But this new interpretation does not match their constitutional theory. The Gmeiners argue that the indemnification clause violates the Petition Clause because it burdens their potential lawsuits against the State. Even if the indemnification clause would require the Gmeiners to pay attorney's fees for frivolous suits by *others*, this payment obligation would not affect *their*

petitioning rights. Besides, Kent's counsel stated that he did not "believe" Michigan could seek indemnification for attorney's fees in this scenario because the clause applies only to damages liability. *Id.* at 18:03–19:30; *cf. Hold Harmless*, Black's Law Dictionary (12th ed. 2024).

The Gmeiners also argue that this case's procedural posture requires us to accept their broad view of the indemnification clause. At this motion-to-dismiss stage, they say, we must "resolve[] ambiguity" about the clause's scope in their favor. Appellants' Br. 16. Yet they mistake a legal question for a factual one. It is not obvious whether we should apply contract-law principles or ordinary statutory-interpretation principles to this permit's language. Either way, courts answer questions of law (not fact) when they decide what a text means and whether it is ambiguous. *See Robertson v. DaimlerChrysler Corp.*, 641 N.W.2d 567, 571 (Mich. 2002); *Henderson v. State Farm Fire & Cas. Co.*, 596 N.W.2d 190, 193 (Mich. 1999). We thus need not accept the Gmeiners' "legal conclusions" about the indemnification clause's scope at this pleading stage. *Rudd*, 977 F.3d at 511. As a matter of law, the clause has an unambiguously narrow meaning.

2

These two conclusions—that the indemnification clause has a narrow scope and that we will assume that the takings test applies—make this case easy. When read narrowly, the clause satisfies the two requirements from *Nollan* and *Dolan*. *See Sheetz*, 601 U.S. at 275–76.

At the outset, though, we note a word of caution. Recall that all unconstitutional-conditions claims start with a "generic" (yet right-specific) "rule": no constitutional problem exists if the relevant right would allow the government to impose the challenged condition directly on everyone as a governmental command. *Knight*, 67 F.4th at 824. For at least three reasons, it is not obvious that the Gmeiners' constitutional theory should proceed beyond this threshold requirement.

*First*, some Justices have doubted whether the right to "petition" includes the right to sue. U.S. Const. amend. I; *see Guarnieri*, 564 U.S. at 403 (Scalia, J., concurring in the judgment in part and dissenting in part); *id.* at 399 (Thomas, J., concurring in the judgment). These Justices point to the scope of the preexisting right to petition. Historical sources identified the petition's

audience as the *executive* or *legislative* branches—not the *courts*. *See id.* at 403 (Scalia, J., concurring in the judgment in part and dissenting in part). And the Supreme Court did not start suggesting that the Petition Clause covered lawsuits until the 1970s. *See id.* at 403–04. Nor, it appears, has the Court ever "*held*" that it extends this far. *See id.* at 402. Under this narrow view, the right to petition would not protect the lawsuits allegedly burdened by the indemnification clause.

Admittedly, some scholars disagree. *See id.* at 404. Of most note, the Petition Clause grants the right to petition the "Government," not just the Congress or President. U.S. Const. amend. I. So its text stands in contrast to some preexisting sources (such as an amendment proposed during the Maryland ratifying convention) that would have granted "a right to petition *the legislature* for the redress of grievances[.]" 2 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 553 (Jonathan Elliot ed., 2d ed. 1836) (emphasis added); James E. Pfander, *Sovereign Immunity and the Right to Petition: Toward a First Amendment Right to Pursue Judicial Claims Against the Government*, 91 Nw. U. L. Rev. 899, 956–57 (1997). And the Court itself has long assumed that the Petition Clause covers litigation. *See Guarnieri*, 564 U.S. at 387. We will do the same.

That leads us to our *second* point. The Gmeiners read the Petition Clause in an extravagant way. Their argument, neutrally applied, would mean that the Petition Clause bars a State from changing the *substantive rules of liability* governing who should be held liable for tortious conduct. Under their broad view of the indemnification clause, they claim that it forces them to incur liability for Michigan's harm-causing conduct. Under our narrow view of the clause, they claim that it forces them to incur liability for their own harm-causing conduct. Either way, they say that the choice to relieve Michigan of liability "burdens" their right to petition the courts because the clause will cause them to *lose* any suit they may file against the State over this conduct.

But even if the Petition Clause gave the Gmeiners a right to sue, we are dubious of their broader claim that it gives them a right to *win*. *See* Lawson & Seidman, *supra*, at 757–58; Carol Rice Andrews, *A Right of Access to Court Under the Petition Clause of the First Amendment: Defining the Right*, 60 Ohio St. L.J. 557, 644 (1999). Under the ordinary meaning of "petition,"

the people have a right to "solicit" the government with requests, not to compel the government to take their requested action. 2 Samuel Johnson, *Dictionary of the English Language* 323 (4th ed. 1773). And the Supreme Court has held that the government does not even have a duty to respond to a petition, *see Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 285 (1984), so we are hard pressed to see how it has a duty to grant the petition. On the contrary, our Constitution has long left it to the States to determine the substantive rules of liability for private conduct "as they see fit." *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 639–40 (2013). And "substantive" due process finds no better textual home if we move it from the Fourteenth Amendment to the First.

*Third*, and finally, even under the dubious assumption that the Petition Clause limits the States' ability to depart from traditional liability rules, our narrow view of the indemnification clause places it well within the States' "regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 692 (2024). Courts have "always" "recognized" that a party may seek "indemnity" from a wrongdoer if the wrongdoer's acts cause the party to incur legal liability. Restatement (Second) of Torts § 886B cmt. a (A.L.I. 1979); *see* Restatement (First) of Restitution § 76 (A.L.I. 1937); Thomas M. Cooley, *Treatise on the Law of Torts* 144–47 (1879). Indeed, municipalities that are held liable for unsafe conditions on their public streets have long sought indemnity from the wrongdoers who created the unsafe conditions. *See* Restatement (First) of Restitution § 95 rep. notes (collecting cases); *see also* W. Page Keeton et al., *Prosser and Keeton on Torts* § 51, at 342 (5th ed. 1984). The Supreme Court, for example, held that Chicago had a right to seek indemnity from a landowner who "wrongfully excavated in the sidewalk next to" his property and "greatly injured" a pedestrian who fell into a hole in the road. *City of Chicago v. Robbins*, 67 U.S. 418, 420, 422–29 (1862); *see also Wash. Gaslight Co. v. District of Columbia*, 161 U.S. 316, 327–28 (1896); *Inhabitants of Lowell v. Bos. & Lowell R.R. Corp.*, 40 Mass. 24, 31–34 (1839).

The Gmeiners point to no source suggesting that this "universal and long-established tradition" of indemnity intruded on any First Amendment right. *Guarnieri*, 564 U.S. at 404 (Scalia, J., concurring in the judgment in part and dissenting in part) (quoting *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122 (2011)). The tradition instead shows that the Petition

Clause likely would permit Michigan to "*directly* compel" the Gmeiners to indemnify it if they negligently built the walkway and a court held the State liable for the resulting harm. *Knight*, 67 F.4th at 824 (emphasis added). Indeed, Michigan has long followed that common-law rule. *See Hart Township v. Noret*, 158 N.W. 17, 18 (Mich. 1916); *see also Dale v. Whiteman*, 202 N.W.2d 797, 800 (Mich. 1972). So we struggle to see why Michigan could not "*indirectly* compel" the same background rule as a "condition on" a permit. *Knight*, 67 F.4th at 824 (emphasis added).

Ultimately, however, we need not resolve the Gmeiners' unconstitutional-conditions claim at this first step. Even if we assume that Michigan could not directly impose the indemnification clause on all Michiganders, the clause satisfies the two requirements from *Nollan* and *Dolan*. For starters, the clause has a clear "nexus" to the "social costs" of the Gmeiners' proposed construction. *Id.* at 825 (quoting *Nollan*, 483 U.S. at 837). The clause gets triggered if their harmful conduct (say, the building of a shoddy path) forces the State and its taxpayers to pay a money judgment. It thus requires the Gmeiners to "internalize the costs" of their actions. *Id.* at 824; *see Koontz*, 570 U.S. at 605. And a "rough" (if not perfect) "proportionality" exists between the indemnification clause's "burdens on the owner" and the "project's burdens on society." *Knight*, 67 F.4th at 825 (quoting *Dolan*, 512 U.S. at 391). The Gmeiners' indemnification duty for claims "arising from" their "acts or omissions . . . in connection with th[e] permit" will match the costs they impose on Michigan. Permit, R.1-4, PageID 42. In sum, the indemnification clause requires the Gmeiners to pay only for "harms resulting from" their conduct, so it poses no unconstitutional-conditions problem even under the takings test that they ask us to apply. *Sheetz*, 601 U.S. at 276.

### B. State "Ultra Vires" Claim

The Gmeiners also argue that Kent's decision to impose the indemnification clause represented an "ultra vires" act because no Michigan law authorized the decision. But we agree with the district court that Michigan's sovereign immunity bars this state-law claim.

At the Founding, governments had long enjoyed an immunity from suit as an "inherent" aspect of their "sovereignty" that barred private parties from litigating against them in court "*without* [*their*] *consent*." The Federalist No. 81, at 486 (A. Hamilton) (Clinton Rossiter ed.,

1961). The Constitution generally retained this background rule of sovereign immunity for the States. *See Alden v. Maine*, 527 U.S. 706, 713 (1999); *Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005) (en banc). And the background rule restricts not just suits against the States in their own names but also suits against state agencies and officers sued in their official capacities. *See Pichiorri v. Burghes*, 162 F.4th 745, 752 (6th Cir. 2025) (citing *Lewis v. Clarke*, 581 U.S. 155, 162 (2017); *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985)).

The Gmeiners do not dispute that Michigan is "the real party in interest" in their suit against Kent and thus that Kent may "invoke" the State's sovereign immunity. *Lewis*, 581 U.S. at 162. That concession makes good sense. Michigan's sovereign immunity extends "to state agencies" like the Department of Environment, Great Lakes, and Energy. *Boler v. Earley*, 865 F.3d 391, 410 (6th Cir. 2017); *see* Mich. Comp. Laws § 324.99903. And the Gmeiners sued Kent in her "official capacity" as an analyst for this Michigan department. Compl., R.1, PageID 1–2, 8. Their suit, then, is really "a suit against the official's office" and "no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

The Gmeiners instead argue that their state-law claim against Kent falls within at least one of two potential exceptions to sovereign immunity. The first exception—established by *Ex Parte Young*, 209 U.S. 123 (1908)—allows private parties to sue state officers in their official capacities for forward-looking injunctive relief. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102–03 (1984); *Ernst*, 427 F.3d at 367–68. The second exception allows Congress to abrogate a State's sovereign immunity if Congress acts pursuant to "a valid exercise of constitutional authority." *Allen v. Cooper*, 589 U.S. 248, 255 (2020) (quoting *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 78 (2000)). Yet neither exception saves the Gmeiners' state-law claim.

*Ex Parte Young*. The exception that *Ex Parte Young* created does not help the Gmeiners because of an important limit to its scope: the plaintiff must allege that a state officer "violate[d] *federal* law." *Ernst*, 427 F.3d at 367 (emphasis added). Under the Supreme Court's decision in *Pennhurst*, the exception does not apply if the plaintiff instead alleges that the officer violated *state* law. 465 U.S. at 106. As *Pennhurst* explained, federal courts would inflict significant damage to our federalist system if they could tell state officers "how to conform their conduct to

state law." *Id.* The Constitution reserves that role to state legislatures and courts, not federal actors.

*Pennhurst*'s limit on *Ex Parte Young* dooms the Gmeiners' "ultra vires" claim because the claim seeks state-law relief. The Gmeiners requested a declaration that Kent acted in an illegal manner because nothing in Michigan's Natural Resources and Environmental Protection Act allowed her to impose the indemnification clause on them. And they requested an injunction barring Kent from adding this clause to the permit on this state-law ground. In short, the Gmeiners' ultra vires claim seeks to bring Michigan "into compliance with" its own law, so sovereign immunity bars the Gmeiners from pursuing the claim in a federal venue. *Ernst*, 427 F.3d at 368; *see In re Ohio Execution Protocol Litig.*, 709 F. App'x 779, 782–83 (6th Cir. 2017) (per curiam).

The Gmeiners try to distinguish *Pennhurst* on the ground that we must decide their state-law claim "in the course of resolving" their federal unconstitutional-conditions claim. Appellants' Br. 23. As they see things, their federal constitutional claim's validity *rests* on the indemnification clause's invalidity under state law. It is true that a federal constitutional question can sometimes depend on the unsettled meaning of state law. For example, a state statute might comport with the Constitution if given a narrow interpretation and violate the Constitution if given a broad one. *Cf. Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393–97 (1988); *Fischer v. Thomas*, 176 F.4th 470, 475–78 (6th Cir. 2026). But the Gmeiners do not raise that type of state-law interpretive question. They instead interpret the First Amendment *itself* to depend on a state officer's violation of state law. That reading is mistaken. If the indemnification clause imposed an unconstitutional condition, it would not matter whether Kent's "conduct [was] legal or illegal as a matter of state law." *McNeese v. Bd. of Educ. for Cmty. Unit Sch. Dist. 187*, 373 U.S. 668, 674 (1963). And we know of no case suggesting that the state-law question (Did a statute give Kent the power to require the indemnification clause?) could affect the federal question (Does the indemnification clause violate the First Amendment?). *Cf. Virginia v. Moore*, 553 U.S. 164, 176 (2008); *Nordlinger v. Hahn*, 505 U.S. 1, 26 (1992) (Thomas, J., concurring in part and concurring in the judgment).

Regardless, this argument is beside the point.  Even if a federal right did incorporate state law in the way that the Gmeiners propose, the *Ex Parte Young* exception might permit us to grant forward-looking relief based on the violation of *that* right.  *See Ernst*, 427 F.3d at 358.  That is why we have not dismissed the Gmeiners' federal claim on sovereign-immunity grounds.  But the Gmeiners seek injunctive and declaratory relief on their state-law claim *independent* of any federal violation.  *Pennhurst* bars that relief—no matter how state law might affect their federal claim.

*Congressional Abrogation*.  The Gmeiners fare no better by relying on Congress's power to abrogate a State's sovereign immunity.  They argue that Congress abrogated this immunity when it granted district courts supplemental jurisdiction over state-law claims, *see* 28 U.S.C. § 1367, and when it authorized those courts to issue declaratory relief in the Declaratory Judgment Act, *see id.* § 2201.  This theory also lacks merit.

To decide whether Congress has validly abrogated sovereign immunity, the Supreme Court follows a two-step approach.  *See Allen*, 589 U.S. at 255.  At step one, it asks whether Congress has in fact abrogated that immunity.  *See id.*  Congress must use "unequivocal statutory language" to achieve this result.  *Id.* (citation omitted); *see Fin. Oversight & Mgmt. Bd. for P.R. v. Centro de Periodismo Investigativo, Inc.*, 598 U.S. 339, 346–48 (2023).  At step two, it asks whether Congress has the constitutional power to take this action.  *See Allen*, 589 U.S. at 255.

The Gmeiners cannot get past the first step.  Neither the supplemental-jurisdiction statute nor the Declaratory Judgment Act abrogated the States' sovereign immunity.  The first of these laws gives a district court supplemental jurisdiction to adjudicate "claims that are so related to" those over which the court has "original jurisdiction that [all the claims] form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  The Gmeiners invoke § 1367(a) because their federal and state claims "arise from a single, indivisible set of" allegations.  Appellants' Br. 21.  But they point to no "unequivocal statutory language" in § 1367(a) that abrogates the States' immunity from suit.  *Allen*, 589 U.S. at 255 (citation omitted).  To the contrary, the Supreme Court has held that this statute's text "does not extend to claims against nonconsenting state defendants."  *Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 542 (2002).  So when sovereign immunity bars a state-law claim, it does not

matter that "supplemental jurisdiction otherwise exists." *Ohio Execution Protocol Litig.*, 709 F. App'x at 783.

The Declaratory Judgment Act also does not allow the Gmeiners to bypass Michigan's immunity from suit. It grants a district court discretion to "declare the rights and other legal relations of any interested party" "[i]n a case of actual controversy within its jurisdiction[.]" 28 U.S.C. § 2201(a). This statute likewise contains no "unequivocal statutory language" that abrogates the States' sovereign immunity. *Allen*, 589 U.S. at 255 (citation omitted); *see Fischer*, 176 F.4th at 476. It does not expressly mention the States' immunity. *See Fin. Oversight & Mgmt. Bd.*, 598 U.S. at 347. Nor does it create a cause of action specifically against the States. *See id.* at 347–48. To the contrary, the Declaratory Judgment Act creates only an additional *remedy*. It thus does not give a district court subject-matter jurisdiction to adjudicate state-law claims against *anyone*, let alone *nonconsenting States*. *See Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 902 (6th Cir. 2014); *Toledo v. Jackson*, 485 F.3d 836, 839 (6th Cir. 2007). So plaintiffs seeking this remedy must identify an "independent" source for the district court's jurisdiction and for their cause of action. *Mich. Corr. Org.*, 774 F.3d at 902. Suffice it to say, a statute that tacks on another remedy to existing causes of action does not speak with the "unmistakable" clarity required to abrogate sovereign immunity. *Fin. Oversight & Mgmt. Bd.*, 598 U.S. at 342.

The Gmeiners respond that our holding "effectively leaves no forum" to resolve their state and federal claims together "without duplicative litigation." Appellants' Br. 24. This response disrespects the state courts. Those courts can protect federal rights just as well as their federal counterparts. *See Burt v. Titlow*, 571 U.S. 12, 19 (2013). Indeed, the Constitution did not even require Congress to create lower federal courts. *Cf.* U.S. Const. art. I, § 8, cl. 9. So if the Gmeiners wanted a single venue to avoid duplicative litigation, they could have sued in a Michigan forum. Their failure to do so offers no basis to disregard Michigan's immunity.

\* \* \*

Even though the Gmeiners have lost this suit, our resolution should go a long way toward assuaging their concerns. When negotiating with Kent over the indemnification clause, the

Gmeiners asked for a disclaimer that the clause did not cover "claims" they might have "against the State of Michigan for actions taken or committed by the State of Michigan and or its agents prior to the date of said permit." Emails, R.1-3, PageID 37. A state officer acting in her official capacity has now agreed that the clause has this narrow scope, covering claims brought against Michigan only for the Gmeiners' own actions or omissions.

We affirm.